IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| COPELAND CORPORATION, | : | |
| Plaintiff, | : | Case No.  3:04CV398 |
| vs. | : | Magistrate Judge Sharon L. Ovington (by consent of the parties) |
| CHOICE FABRICATORS, INC., | : | |
| Defendant. | : | |

**ORDER OVERRULING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 60); ORDER OVERRULING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 57)**

## I. INTRODUCTION

Plaintiff, Copeland Corporation ("Copeland") is an Ohio Corporation in the business of manufacturing air conditioners. Defendant, Choice Fabricators, Inc.'s ("Choice") is an Alabama corporation in the business of manufacturing component parts for customers such as Copeland. This matter is before the Court upon Copeland's Motion for Partial Summary Judgment (Doc. # 60); Choice's Motion for Summary Judgment (Doc. # 57); the parties respective Replies (Doc. # 71, 72, 78, 81), and the record as a whole.

## II. FACTUAL BACKGROUND

In 2001, Copeland sought bids from manufacturers interested in supplying Copeland with certain stamped steel parts for a three year term. Copeland conducted a "reverse auction" in which companies submitted online bids to Copeland. Because the reverse auction was conducted

through a company known as Free Markets, the parties designated in the contract the parts that were part of the reverse auction as "Free Market Parts." Choice submitted the winning bid and was awarded the exclusive contract to supply Copeland.

On November 12, 2001, the parties entered into a Long Term Agreement beginning on December 1, 2001 to December 1, 2004. (Doc. # 42, Exhibit 1) In addition to the Free Market Parts, Copeland also agreed to purchases for "Non-Free Market Parts," including stamped steel parts which Choice had already been supplying to Copeland and which were not included in the Free Markets auction. These parts were subject to a reduction of 2% at the end of the first year, and an additional 2% at the end of the second year. ( Doc. # 42, Exhibit 1, Exhibit C).

Len Hubbard ("Hubbard") negotiated the contract on behalf of Copeland. (Hubbard Depo. at 30). Darlene Gilliland ("Gilliland") negotiated the contract on behalf of Choice. (Gilliland Depo. at 8). In the course of negotiation, Choice sought but did not receive a term in the long term agreement for a price escalation in the event that the price of steel rose. As part of the negotiation, Gilliland on October 25, 2001, sent an e-mail to Hubbard requesting a "price escalation clause," a provision permitting Choice to increase its prices if its steel prices increased. She stated:

> How do you want to address the material swings? If we are going to commit to these cost savings initiatives there has to be some way to equalize our pricing to the material market. Maybe we need to say that if the market swings more than a certain percentage either way, material costs will be re-negotiated. What do you think?

(Doc. # 60, Exhibit E).

Hubbard replied that Copeland would accept smaller price reductions on Non-Free Market parts if Choice would agree to firm pricing on the Free Market parts, without any adjustment in the raw material market. In response Gillian wrote:

2

> Basically you want [price reduction on parts] with no concessions to [Choice] for an upturn in the material market. Which we both know is going to happen in the not so distant future. (Doc. # 60, Exhibit E).

Gilliland responded with a counter proposal agreeing to firm pricing but again lowering the yearly price reductions. She stated: "Then we [Choice] don't need a material concession." Further: "We [Choice] also take any upswing in the material market." (Doc. # 60, Exhibit F). The final agreement between the parties did not contain a clause that allowed for contract adjustments caused by material increases. Concerning termination, the agreement allowed either party to provide six months written notice to terminate the agreement. The agreement did not contain a "no oral modification" clause. During the period of the long term agreement, Copeland issued purchase orders covering the products Choice was to manufacture. The terms of the purchase orders contain language differing from the long term agreement.

At the time of the negotiation of the long term agreement, steel prices were low. Neither Hubbard nor Gilliland anticipated that the prices would eventually elevate to the levels they did. (Hubbard Depo. at 73-74; Gilliland Depo. at 38, 41, 43-44). In the middle part of 2002 Gilliland (then known as Lawrence) sent an e-mail to Hubbard advising that the prices in the material market were increasing dramatically and that the steel mills were not honoring their commitments. Because of market conditions Choice asked Copeland to defer the 2% price reduction, described in Exhibit C of the agreement, for certain parts. Copeland agreed. (Hubbard Depo. at 86, Exhibit 7)

After Copeland agreed to the 2% deferral of the price reduction set forth in the agreement Copeland representatives began to discuss the possibility of moving Choice's parts to another supplier. Hubbard responded as follows: "I guess the only reason that we might want to consider

3

it [the agreement] intact is that the Agreement may give them [Choice] more incentive to fight off the market." (Hubbard Depo. at 87, Exhibit 7). During this time, Choice was required to buy steel for whatever price the mills demanded in order to manufacturer Copeland parts. (Gilliland Depo. at 181-182). Choice advised Copeland of the situation again in October of 2003. (Hubbard Depo. at 88, Exhibit 8). Once again Copeland considered the possibility of moving Choice's parts to another supplier through the use of an auction. (Hartley Depo. at 97). In November 2003, Hubbard advised his management that "[i]f we can't come up with an option for them, we may be forced to run that one [the auction scheduled for May 2004] sooner." (Hubbard Depo. at 90-92; Exhibit 9). In December 2003, Gilliland notified Copeland that due to the dramatic increased price of steel it had no choice but to pass on additional price increases to Copeland. Gilliland wrote to Hubbard setting forth new price increases effective January 1, 2004. Gilliland further stated: Choice understands if the optimal business decision is to move this business. If this is the case, we simply want to have the opportunity to phase the program out in an efficient and professional manner." (Doc. 72, Exhibit 2).

In January 2004, Choice CEO David Chadwick ("Chadwick") sent a letter to Choice's customers, including Copeland, explaining that the mills which supplied Choice with steel were adding a surcharge on raw steel and increasing Choice's prices. Chadwick stated that, effective February 1, 2004, Choice would begin passing those surcharges on to its customers. (Doc. # 60, Exhibit I).

It is at this point where the parties version of events diverge. According to Copeland, Chad Hartley ("Hartley"), Copeland's commodity manager, objected to the price increase as explicitly prohibited by the agreement. Copeland points to Hartley's correspondence dated

4

March 4, 2004, wherein Hartley states that "the price increase is not permitted under the terms of the long term contract..." (Doc. # 60, Exhibit H).  Hartley explained that because Copeland's plants could not operate without the Choice parts, Copeland would pay the new prices, under protest and "reserve its rights" *Id*. Over the following months, the same procedure was followed by Copeland. Copeland continued to pay the increased price for the Choice parts and then sent letters of protest. ( Doc. # 60 at  6-7).

Choice submits that Gilliland had numerous discussions with Copeland about ways to work through the problems caused by steel price increases. Moreover, Choice states that Hartley "... understood Choice's predicament", and that "He [Hartley] and Ms. Gilliland negotiated and agreed to revised pricing caused by the surcharges and steel price increases." (Doc. # 57 at 11-12). Choice provided Copeland with spreadsheets reflecting the revised pricing caused by the steel increases on a monthly basis. (Gilliland Depo. at 92). Hartley recalled filling out a "price change disposition form" reflecting the price increases. (Hartley Depo. at 128). According to Choice, in conversations with Gilliland and Chadwick, Hartley told them that the protest letter was simply a form letter that was sent to all customers, that "this is nothing more than something I have to have for my file," and "not to worry about it." (Chadwick Depo. at 91, 93, 97; Gilliland Depo. at 235-237). Hartley denies making such statements. (Hartley Depo at 130-131).

### III.    SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment in its favor if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247 (1986).  To determine if a genuine issue of material fact exists, the Court

accepts the nonmoving party's evidence as true and draws all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *see Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 642 (6th Cir. 2000). The Court's function is not to weigh the evidence to determine the truth of the matters asserted but to determine if there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 249.

"The burden placed upon the movant for summary judgment is to show that the nonmoving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992); *see Hager v. Pike County Bd. of Education*, 286 F.3d 366, 370 (6th Cir. 2002). If the movant makes this showing, the nonmoving party may not rely on the bare allegations of the Complaint but must present affirmative or "significant probative evidence..." in support of his or her claims. *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002); *see Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). The purpose driving this requirement is that summary judgment is designed to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Lenz v. Erdmann Corp*., 773 F.2d 62, 66 (6th Cir. 1985)(citation omitted); *see Matsushita*, 475 U.S. at 587.

The Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino,* 980 F.2d at 404; *see InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the burden falls squarely on the nonmoving party to designate specific

facts or evidence in dispute. *See Anderson*, 477 U.S. at 250; *see also Adams*, 31 F.3d at 379; *Guarino*, 980 F.2d at 404-05; *Street*, 886 F.2d at 1479-80.

Ultimately, the Court must determine at the summary-judgment stage whether the evidence presents a sufficient disagreement to require submission of the challenged claim or claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *see Little Caesar Enterprises*, 219 F.3d at 551.

IV.     ANALYSIS[1]

**GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE PARTIES WAIVED OR MODIFIED THE FIXED PRICE TERMS IN THE LONG TERM AGREEMENT**

In its Motion for Partial Summary Judgment, Copeland argues that "Copeland and Choice entered into an unambiguous, enforceable contract. During negotiations, Choice made an affirmative, express decision to accept the risk that steel prices would increase. Choice's attempt to rewrite the Contract based on hindsight is contrary to well-settled law and should be prohibited." (Doc. # 60 at 8).  Choice, on the other hand, moves for Summary Judgment on the grounds that the parties modified the long term agreement as a result of the dramatic swing in material costs. (Doc. #57 at 6-9 ). Because the Court concludes that material issues of fact exist as to whether the parties modified or waived the fixed price terms in the long term agreement, summary judgement is inappropriate.

---

[1] Plaintiff has invoked this Court's diversity jurisdiction; therefore, it must apply Ohio's choice-of-law principles. *See Klaxon Co. V. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S. Ct. 1020 (1941). In their pleadings, the parties have cited and relied upon the law of Ohio. Accordingly, the Court will apply Ohio law. *See ECHO Inc. V. Whitson Co., Inc.,* 52 F. 3d 702, 707, (7th Cir. 1995)(Where neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law).

Copeland correctly asserts that pursuant to Ohio law, the interpretation of an unambiguous written contract is a matter of law for the Court. *Alexander v. Buckeye Pipeline Co.,* 53 Ohio St. 2d 241 (1978). Thus, according to Copeland, the fixed prices set forth in the original agreement must control especially where the increase in steel prices was both foreseeable and expected. In reliance, Copeland cites *Chainworks v. Webco,* 2006 U.S. Dist. Lexis 9194 (W.D. Mich. Feb. 24, 2006. In *Chainworks*, Webco, a steel tubing manufacturer, negotiated a fixed price contract with Chainworks in December 2003 for the year 2004. Before the contract was finalized, Webco was aware that the steel mills were imposing surcharges for steel. Thereafter, Webco attempted to pass material surcharges on to its customer Chainworks. The Court found that "[t]he undisputed evidence ... shows that the parties knew that the steel market was volatile and that an increase in raw material prices was foreseeable." *Id*. at 10-11. The Court therefore rejected Webco's defense of commercial impracticability and granted summary judgment in favor of Chainworks. Copeland argues that the same result should apply here. However, Copeland's reliance on *Chainworks* is misplaced. The defense of commercial impracticability is inapplicable here. Choice contends that the long term agreement was modified or waived as to the price terms. The *Chainworks* Court does address the issue of modification but found that Webco "unilaterally imposed the price increase and forced Chainworks to accept it under the threat of repudiating the contract." *Id.* at 9. While Copeland's version of the facts supports this view, Choice has offered more than a scintilla of evidence that Choice, rather than utilizing the six month termination provision and reliance on a commercial impracticability defense, continued to perform for the duration of the contract term with the fixed price terms as modified or waived. For this reason the Court finds *Chainworks* to be inapplicable to the facts of

the instant case.

As noted by the Court in *Fisk Alloy Wire, Inc., v. Hemsath,* 2005 Ohio 7007; 2005 Ohio App. Lexis 6311:

> Thus, although courts must presume that the parties expressed their intentions in the language chosen for a written contract, *Shifrin v. Forest City Ent., Inc.,* (1992), 64 Ohio St. 3d 635, 597 N.E.2d 499, 'subsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary. A gratuitous oral agreement to modify a prior contract is binding if it is acted upon by the parties and if a refusal to enforce the modification would result in a fraud or injury to the promisee.' *Smaldino v. Larsick,*(1993) 90 Ohio App. 3d 691, 698, 630 N.E.2d 408. Subsequent acts or agreements may modify or operate as a waiver of commercial sales contract terms: *Paramount Supply Co. v. Sherlin Corp.,* 16 Ohio App. 3d 176, 475 N.E.2d 197 (1984).

In recognition of the fact that contracts for the sale of goods do not always remain fixed and unchanged, the Uniform Commercial Code recognizes that the parties may subsequently modify their contract by subsequent agreement or by conduct amounting to waiver or estoppel. See J. White and R. Summers, Uniform Commercial Code, at 42-43 (1980).  R.C. § 1302.12 (U.C.C. §2-209)   Provides:

> (A) An agreement modifying a contract within sections 1302.01 to 1302.98, inclusive, of the Revised Code, needs no consideration to be binding.
>
> (B) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.
>
> (C) The requirements of section 1302.04 of the Revised Code, must be satisfied if the contract as modified is within its provisions.
>
> (D) Although an attempt at modification or rescission does not satisfy the requirements of division (B) or (C) of this section, it can operate as a waiver.
>
> (E) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction

would be unjust in view of a material change of position in reliance on the waiver.

The terms "modification" and "rescission" include any change or abandonment by mutual consent of the parties. They do not refer to unilateral termination or cancellation of a contract. R. C. § 1302.12, Official Comment 3. Copeland is correct in asserting that the claimed modification must be based on the consent of both parties. (Doc. # 81 at 6). In *Agroindustrias Vezel v. H.P. Schmid, Inc.,* (9th Cir. 1994), 15 F. 3d 1082, cited by Choice, the parties reluctantly agreed to a price increase. Here, genuine issues of material fact exist as to whether such an agreement to modify or waive[2] the price terms occurred. Therefore the Court finds *Agroindustrias Vezel, supra,* to be distinguishable and not controlling.

Unless a writing is required by the Statute of Frauds, R.C.§ 1302.04, a modification of a contract may be implied by the subsequent acts of the parties that demonstrate a meeting of the minds to modify its terms. Herein, Copeland argues that the defense of modification is an affirmative defense which must be affirmatively raised. (Doc. # 71 at 2). Because the Court agrees with the reasoning set forth in *Coldwell Banker Residential Real Estate Serv. v. Sophista Homes, Inc.,* 1992 WL 303073 (Ohio App. 2nd Dist.), which held that modification is not an affirmative defense under Ohio law, Choice is not precluded from raising the defense.

Copeland further argues that any alleged modification fails to comply with the Statute of

---

[2]Under the law of Ohio, waiver is defined as the voluntary relinquishment of a known right. *Chubb v. Ohio Bureau of Workers' Compensation*, 81 Ohio St. 3d 275, 278 (1998). "As a general rule, the doctrine of waiver is applicable to all personal rights, whether secured by contract, conferred by statute, or guaranteed by the Constitution, provided that the waiver does not violate public policy." *Athens Cty. Bd. Of Commrs. V. Gallia, Jackson, Meigs, Vinton Joint Solid Waste Mgt. Dist. Bd. Of Directors,* 75 Ohio St. 3d 611, 616 (1996). A waiver may be either express or implied from a party's conduct. *Griffith v. Linton*, 130 Ohio App. 3d 746 (1998). It bears emphasis that, under the law of Ohio, it is for a jury to determine whether a party's conduct constitutes a waiver of its rights. *Monteith v. Community Mutual*, 1994 WL 183642 (Ohio App. 1994); *Apponi v. Sunshine Biscuits, Inc.,* 809 F. 2d 1210, 1216 (6th Cir. 1987).

Frauds and be in writing.(Doc. # 81 at 5). R.C.§ 1302.04 (U.C.C. 2-201) provides:

> (A) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.
>
> (B) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.
>
> (C) A contract which does not satisfy the requirements of division (A) of this section but which is valid in other respects is enforceable:
>
> (1) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or
>
> (2) if the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
>
> (3) with respect to goods for which payment has been made and accepted or which have been received and accepted in accordance with section 1302.64 of the Revised Code.

The long term agreement clearly does not contain a "no oral modification" clause and therefore R.C. § 1302.04 (B) does not apply. The Official Comment to R.C. § 1302.04 at 1 states:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.

11

The Court concludes that the writings attached to the Hartley, Hubbard and Gilliland Depositions afford a basis for believing that the offered oral evidence rests on a real transaction and accordingly the Statute of Frauds does not bar Choice from its opportunity to prove the claimed modification or waiver at trial. However, Choice must do more than prove mutual assent to the modification or waiver of the Long Term Agreement, because pursuant to *Roth Steel Products Co. v. Sharon Steel Corp.*, 705 F.2d 134 (6th Cir. 1983), once a modification is proved, the party asserting the modification must also show that it was done in good faith:

> In determining whether a particular modification was obtained in good faith, a court must make two distinct inquiries: whether the party's conduct is consistent with "reasonable commercial standards of fair dealing in the trade," *U.S. for Use and Benefit of Crane Co. v. Progressive Enterprises*, 418 F. Supp. 662, 664 n.1 (E.D. Va. 1976), and whether the parties were in fact motivated to seek modification by an honest desire to compensate for commercial exigencies. See *Ralston Purina Co. v. McNabb*, 381 F. Supp. at 183 (subjective purpose [to maximize damages] of extending time of performance under contract indicates bad faith and renders modification invalid); O.R.C. Sec. 1302.01(2) (U.C.C. Sec. 2-103). The first inquiry is relatively straightforward; the party asserting the modification must demonstrate that his decision to seek modification was the result of a factor, such as increased costs, which would cause an ordinary merchant to seek a modification of the contract. See Official Comment 2, O.R.C. Sec. 1302.12 (U.C.C. Sec. 2-209) (reasonable commercial standards may require objective reason); J. White & R. Summers, Handbook of Law under the U.C.C. at 41. The second inquiry, regarding the subjective honesty of the parties, is less clearly defined. Essentially, this inquiry requires the party asserting the modification to demonstrate that he was, in fact, motivated by a legitimate commercial reason and that such a reason is not offered merely as a pretext. *Ralston Purina Co. v. McNabb*, 381 F. Supp. at 183-84. Moreover, the trier of fact must determine whether the means used to obtain the modification are an impermissable attempt to obtain a modification by extortion or overreaching. *Erie County Water Authority v. Hen-Gar Construction*, 473 F. Supp. at 1313; Official Comment 2, O.R.C.  Sec. 1302.12 (U.C.C. Sec. 2-209). See J. White and R. Summers, handbook of the Law under the Uniform Commercial Code, at 40-41 (1972).

705 F.2d at 146-147. As noted by the Sixth Circuit, it is up to the trier of fact to reach a determination on these issues.

### V.     CONCLUSION

Genuine issues of material fact preclude either part from obtaining summary judgment. Accordingly, Copeland's Partial Motion for Summary Judgment (Doc. # 60), is overruled and Choice's Motion for Summary Judgment (Doc. #57) is overruled.

April 2, 2007

s/ Sharon L. Ovington
Sharon L. Ovington
United States Magistrate Judge
